By the Court—Woodruff, J.
It is proved in this case, without contradiction, that the note upon which the action is brought, was given in advance for premiums of insurance upon an open policy, intended to cover such insurance as might, after the note was given, be effected by the defendants with The Reliance Mutual Insurance Company, and be evidenced by indorsements upon such policy.
And the arrangement between the defendants and the Company plainly contemplated the payment by the defendants, at the maturity of the note, of such sum only as had then bpen earned for premiums upon the risks, which had, up to that time, been assumed by the Company and indorsed on such policy.
Considering the rights of the Company and of the defendants, without reference to the provisions of the public statute, under which the Company was organized, it is clear that the Company could collect from the defendants no greater sum than the amount of premiums earned by the Company.
On this subject, what is called the charter of the Company— its constitution, as agreed upon by its founders—is explicit in providing, that although the Company might negotiate notes received for premiums in advance, from persons who might intend to receive its policies, for the purpose of paying claims or *27 otherwise in the regular transaction of its business, yet that “notes received in advance of premiums on open policies, should in no case be deemed liable for any losses that may accrue beyond the actual earnings on such policies.”
This provision describes the note given by the defendants, and now in suit. And although by its terms the defendants took the hazard of being compelled to pay their note in full, had it been negotiated to a third person by the Company in payment oD claims, in due course of business, and of seeking reimbursement from the Company, in so far as the amount had not been earned; yet the Company itself could not require the payment of more than had been so earned upon risks indorsed on the policy for which it was given.
Under the terms of the charter, the notes and the policy were not independent contracts, so that the Company could collect the notes, whether the premiums already earned were greater or less, and treat the open policy as itself the consideration of the note. As between themselves, the note and the policy are to be deemed in subordination to the provisions of the charter, and the note payable, to the Company, only to the extent of premiums earned.
Indeed, if it were not in terms so provided in the charter, we think it clear that even if it were conceded that the Company might require the defendants to continue their insurance until the amount provided for in the open policy had been insured; the Company from time to time receiving premiums actually earned, an'd renewing the premium note for the amount unearned; still if the Company ceased its'business and became unable longer to insure the defendants’ property, they could require the defendants to make no further payment. And* if the defendants’ note is to be treated as a “ premium note,” as distinguished from a “ subscription note,” as hereinafter explained, then the defendants were not bound to continue their insurance, but might at any time require the note to be surrendered, on paying the premiums already earned. (Brouwer v. Hill, 1 Sandf., 629.)
This view of the constitution of the Company, and of the contract between the parties, under which the note in suit was given, renders it material to inquire whether there is anything in the nature or scheme of the organization of the Company, or in the *28 public statute under which tnat organization was made, which makes notes so received by the Company a security for the payment of the debts of the Company, or entitles the receiver of the Company acting primarily for the "benefit of creditors, to collect the notes, whether the premiums have been earned or not?
The statute of 1849, (Sess. Laws of 1849, p. 441, chap. 308,) permits an organization for the purposes for which The Reliance Mutual Insurance Company was formed, and requires the associates to file a declaration in the office of the Secretary of State, with a copy of the charter proposed to be adopted by them, and, on complying with the requirements of the act, it makes them an incorporated company.
It permits the associates, after publishing a required notice and filing their declaration and charter, to open books for subscription to the capital stock of the Company, and to keep the same open until the full amount specified in the charter is subscribed; or in case the business of such Company is proposed to be conducted on the plan of mutual insurance, then to '<open boohs to receive propositions and enter into agreements in the manner and to the extent hereinafter specified.
The fifth section of the act then proceeds, (so far as it is material to this case,) in these terms: “Ho joint stock company organized for the purposes mentioned in this act, shall be organized in the city of Hew York * * * with a smaller capital than $150,000; nor shall any company formed for the purpose of doing the business of marine or fire or inland navigation insurance, on the plan of mutual insurance, commence business, if located in the city of Hew York, * * until agreements have been entered into for insurance with at least one hundred applicants ;—the premiums on which, if it be marine, shall amount to $300,000; or if it be fire or inland navigation, shall amount to $200,000; and notes have been received in advance for the premiums on such risks, payable, at the end of, or within twelve months from date thereof, which notes shall be considered a pari of the capital stock and shall be deemed valid, and shall be negotiable and collectible for the purpose of paying any losses which may accrue or otherwise.”
The Legislature have thus proposed a double scheme, in each of which security is provided for dealers with the corporations *29 organized under the act. One authorizes an incorporation, with a cash capital paid in; the other authorizes association upon the plan of mutual insurance, on the terms prescribed in the act.
The one contemplates the contribution, (by the associates and such as may become subscribers,) of a cash capital, to an amount not less than $150,000, which shall be the security and form the reliance of those who may deal with the Company, for the payment of all.claims arising from losses or otherwise.
The other contemplates the making of agreements for insurance by at least one hundred applicants, and the contribution by them of notes, given in advance for premiums thereon, to the amount of $300,000: which notes shall be considered a part of the capital stoclc. And these notes become and are constituted the security of the dealers, by being made collectible for the purpose of paying losses, &c., whether the agreements for insurance are performed or not, and whether, therefore, the premiums for which the notes are so given are earned or not.
Under this last mentioned arrangement it is obvious that those who enter into such agreements cannot withdraw until the whole amount which they have subscribed has been paid in premiums to the Company, and their notes meanwhile stand in lieu of capital paid in. By this means the result is made certain, (if the agreements be performed or the subscribers continue solvent, which the act seems to assume,) that a capital of at least $300,-000 will accrue from subscriptions and constitute the capital, for the security and protection of its dealers.
When the requisites of the act have been complied with, there appears no legal objection to the making of contracts of insurance by the. corporation with parties desiring to insure, upon any terms to which they may agree, e. g., if the Company have organized upon the basis of a cash capital, they may take specified single risks receiving the premium therefor in money or by note for the exact amount, giving such credit as shall be agreed upon; or they may, for the convenience of dealers, issue open policies, applicable only to such particular risks as may be indorsed thereon, protecting themselves by receiving a note for the aggregate premium, to be reduced from time to time as premiums are earned, and with a liability of the dealer to pay to the Company only such premiums as maybe payable for the risks *30 so indorsed. And where the organization of the associates and subscribers was upon the basis of mutual assurance, (the requisites of the act being complied with,) they may in like manner take single specified risks or issue open policies with the like results. In either case the design of the Legislature is accomplished ; the dealers are made presumptively. secure by the capital paid in or the premiums subscribed and. agreed to be paid as capital; and this being done, all dealers stand upon an equal footing in respect of security for the payment of losses; those who pay their premiums in money on specific risks singly insured, and those who receive open policies and make the risks specific, by indorsements*thereon from time to time, as the exigencies of business require.
This construction of the act of 1849 shows the difference between what are in common parlance called “ subscription notes,” {i. e., notes given in advance for premiums on insurance which the makers have agreed to effect with the Company, and which are by the statute to be considered a part of the capital stock,) and notes received by the Company in due course of business after its organization for premiums upon open policies to be earned as risks may from time to time be indorsed thereon, and which are called in general phrase “ premium notes,”
The first class are by the terms of the statute made negotiable and collectible for the purpose of paying any losses which may accrue or otherwise. The others are subject to the ordinary rules of law governing the liabilities of the makers of promissory notes, and as between them and the payees, or any one who claims by no higher equity, subject to the agreement between them.
This same distinction arose and was acted upon in defining the liabilities of the makers of notes of each description under various, special charters granted before the act of 1849 was passed. (Brouwer v. Appleby, 1 Sandf. S. C. R., 158; Hone et al. v. Alien et al., id., 171; Hone et al. v. Folger et al., id., 177; The Same v. Ballin et al., id., 181; The Merchants' Mutual Ins. Co. v. Leeds, id., 183; Deraismes v. The Merchants' Mutual Ins. Co., 1 Comst., 371; and especially Brouwer v. Hill, 1 Sandf., 630,) which last case recognizes not only the difference between subscription notes and premium notes taken on open policies in the ordinary *31 course of business, but also the right of mutual companies to deal in this respect with their customers on the same terms as to the premiums; payable on such policies only to the extent of the risks indorsed thereon, as other companies may do.
The act of 1849, in its leading provisions, so far as they contemplate the plan of mutual insurance, is strikingly like the special charters under which the above cited cases arose. (Laws of 1842, p. 261; Laws of 1843, pp. 66, 73, 50.) And when the particular provisions of the charter agreed upon by the associates forming The Reliance Mutual Insurance Company are read in connection with the act, the resemblance is still nearer.
The provisions of the fifth section of the act of 1849 above recited, here mainly relied upon by the plaintiff’s counsel, are, we apprehend, to receive a construction similar to the twelfth section of those special charters. True, it does not say that the notes therein mentioned may be taken “ for the better security of its dealers,” but it makes them part of the capital stock; which works the some result, in connection with the authority to negotiate and collect them for the purpose of paying losses, &c.
The difference (thus recognized and sanctioned) between subscription notes and premium notes received upon open policies, is also, we think, contemplated and provided for in the sixth section of the charter of the Company to whom the note in question was given. It provides for “ notes received for premiums in advance of such persons as may intend to receive its policies" * * These are subscription notes. The same notes provided for in the fifth section of the statute, and almost in the words of the statute, it provides that the Company may negotiate such notes, for the purpose of paying claims or otherwise, in the regular transaction of its business; justas it may “the usual premium notes for specific risks,” which are of course the Company’s property, and payable when due. “ But notes received in advance of premiums on open policies shall in no case be deemed liable for any losses that may accrue beyond the actual earnings thereon.”
The first class constitute in part the capital of the Company. Those who intend to receive its policies and give their notes in advance as a subscription to enable the Company to commence business, are bound as those who give their notes under the *32 twelfth section of the special charters above referred to for the better security of dealers were bound, and they cannot withdraw their obligation until the whole amount has been paid for premiums on policies received or otherwise, and on the other hand those who as mere dealers receive open policies and give their premium notes therefor are only liable for premiums earned.
And this distinction was further kept up and observed by the Company by providing, as the Vice-President testified, that the givers of the notes called “ subscription notes,” should be entitled to receive five per cent per annum upon the amount of their notes for the risk which they run in thus advancing their notes to the Company with the liability to pay them in full even though the premiums on the insurances actually effected should not amount to so much. This was also a peculiarity of the subscription notes given under the special charters above referred to and in the cases above cited, this consideration had an important influence in the determination of the liability of the makers. (See particularly opinion of Ch. J. Jones in Hone et al. v. Allen and Paxson, 1 Sandf., 171.)
The construction of the act of 1849 has quite recently been considered in the Court of Appeals, in White, Receiver, &c., v. Haight (16 N. Y. R. [2 E. P. Smith], 310). In that case the Union Mutual Insurance Company had, by its charter, provided for conducting its business upon a system of giving notes which were not to be paid or collected at all events, nor to be negotiated, but 'which were to operate as guarantees for the payment of only such share of the losses and expenses as the makers might legally be called upon to pay. But that Company had also, as the very foundation upon which it was by the fifth section of the act of 1849, to commence business, a capital made up of notes, given in advance under agreements for insurance, and it was held that it is to notes of this latter description the provisions of that section alone are applicable. In that case it was conceded that the note in suit was one of those furnished, at the organization of the Company, for the purpose of complying with the provisions of the fifth section, and, therefore, that as the Company had become insolvent, it was payable to the plaintiff absolutely, while the notes, -which, in the conduct of the business of the Company, were received under the stipulation in the charter *33 which limited the liability of the makers, were deemed to stand upon a different basis, and to be only of the force and obligation which the charter defined.
This view of the act of 1849, seems to us to meet precisely the case before us, and it further disposes of the suggestion of the plaintiff's counsel, that the stipulation .that the notes given in advance of premiums upon open policies should in no case be deemed liable for losses beyond the actual earnings on such policies, is illegal and void, because inconsistent with the fifth section of the statute. The Chief Justice says: “The general act of 1849 does not prescribe the manner in which the business of mutual insurance shall be carried on by the companies created under it. The particular mode of operation was left to be provided for by the charter.. * * * I entertain no doubt but that the charter of the Company is legal, so far as it provides for premium notes intended as guarantees, to be available only to the extent of the proportion of losses and expenses properly chargeable thereonand he holds that if the note be of the latter class, the obligation created thereby was that defined in the charter, and the receiver could hold the maker to no greater liability ; while if given as a basis of the organization for risks contracted to be taken, it was to be considered capital, valid, negotiable and collectible, not only to pay losses, but to obtain money for any other lawful purpose.
In this view the statute is consistent with the stipulation in the charter respecting the premium notes, which, in the conduct of the business of the Company, after its organization was completed, and the required subscriptions were secured, they might take from those who received open policies. The object of the Legislature was accomplished when the capital was provided and secured for the protection of those who might sustain losses, <&c. The opinion of the Chief Justice seems to us fully to sustain the view already suggested, and to furnish an exposition of the statute, which, irrespective of its force as an authority to us, commands our full concurrence.
The application of these views is obvious; the proof stands uncontradicted that the note in suit was not one of the subscription notes taken under agreements to insure as a basis of the Company’s institution. But a premium note received in the *34 ordinary course of business for premiums upon an open policy,, which the charter makes available to the extent of premiums earned, and no further, applying to them the ordinary rule applicable to such notes when given to other companies.
The practice of issuing such open policies to dealers, and taking such notes, is believed to be very extensive with all marine insurance companies—a practice of long standing and of great convenience to those who have occasion to make daily or frequent shipments in small amounts, which are specified and protected by a brief indorsement on the policy.
The circumstance that the policy holder becomes, in the case of mutual insurance, entitled to a dividend of profits, if any accrue beyond the accumulation which is provided for, does not alter his liability on his note. That is also one of the conditions upon which his note is given. He is not entitled to dividends in proportion to the amount of his note, but in proportion to the amount of premiums earned on his policy—i. e., in proportion to the amount which he pays in.
And in this the public have no interest; in respect to this the Legislature have imposed no restriction. The act does not prescribe the manner in which the business shall be conducted. It looks to the security to be afforded by a proper amount of subscription notes to be given before the Company shall commence business at all, and these are held to be payable absolutely. When these notes are procured and for that purpose, it leaves the Company to carry on its business under any other arrangements with its dealers which may be agreed upon.
We have discussed the case with some particularity, not because we believed the principles governing the subject were not settled by the previous adjudications, but because the notes which, in the cases referred to were the subject of contest, were found to be in fact “ subscription notes ” in the sense above explained, and our discussion may serve to show that these principles, applied conversely to “ premium notes,” taken in due course of business after the organization of the Company, on open policies, give them validity in favor of the Company, or of its receiver (when the Company becomes insolvent), only to the amount in which premiums have been earned on such policies.
*35 It is uot insisted here that the incorporation of The Reliance Mutual Insurance Company was itself defective. It provided for insurance partly with a cash capital and in part upon the mutual plan. It was doubtless believed that the cash capital ($250,000), being liable to policy holders, whether under fire or marine risks, it was a sufficient compliance with the requirement of the fifth section of the statute, to secure agreements for insurance on the mutual plan and take subscription notes to the additional amount of $100,000, together making up the sum of $350,000, which, under that section, would be regarded as capital. Nor does it seem to us material to enter upon the inquiry whether the incorporation of the Company was legal, or whether' it was. authorized to commence business when $100,000 of notes were so procured. Upon those questions we express no opinion, for if there was in this respect any error or defect, though it might expose the associates to the penalties prescribed in the act, or even though it should leave them without corporate protection, it could not, we think, alter nor affect the liability of dealers upon the notes subsequently received.
Our conclusions of fact, therefore, are, that the note in suit is not a note given by the defendants or received by The Reliance Mutual Insurance Company, in pursuance of an agreement for insurance, and in advance for premiums on such risks, which, under the provisions of the fifth section of the act of 1849, is to be deemed •a part of the capital stock, &c., but is a note received in advance for premiums upon an open policy issued in due course of business by the Company after its organization, and after it had commenced business, and was given in renewal in part of a previous like note for such amount as remained unearned on the policy at the date thereof.
And also that after such renewal the Company failed and became insolvent before any further risk was taken or premium earned on such policy.
And thereupon we are of opinion that the defendant is entitled to judgment, and pursuant to the leave reserved by consent of both parties at the trial, the judgment for the defendant should be here entered.
Judgment for the defendant, with costs.